FILED
2019 Oct-15 PM 02:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| MICHAEL PHILLIPS, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 2:18-cv-01165-JEO |
| CITY OF BIRMINGHAM, | ) |
| Defendant. | ) |

## **MEMORANDUM OPINION**

Plaintiff Michael Phillips filed a complaint in the Circuit Court of Jefferson County, Alabama, alleging he was discriminated against by his former employer, the City of Birmingham, because of his race in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §§ 1981 and 1983. (Doc. 1-1 at 5-9).[1] Defendant the City of Birmingham ("the City") removed the case to this court.[2] Now before the court is the motion for summary judgment filed by the City. (Doc. 13). The motion has been fully briefed, (docs. 13-1, 14, 15), and is now ripe for decision. For the reasons that follow, the motion is due to be granted.

---

[1] All evidentiary citations refer to the document and page number provided by CM/ECF, the court's electronic document filing system, except for citations to depositions and, which refer to the page number provided on the deposition transcript.

[2] The parties have consented to the exercise of dispositive jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c). (Doc. 7).

## I. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *See id.* at 324.

The substantive law identifies which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence

is merely colorable, or is not significantly probative, summary judgment may be granted. *See id*. at 249.

## II. STATEMENT OF FACTS

Plaintiff Michael Phillips is a white male who was employed by the City of Birmingham as a police officer from 2008 until May 2018. (Doc. 13-2 ("Phillips Dep.") at 11-13). Phillips' last assignment was at the North Police Precinct, where he worked for approximately seven years as a patrol officer. (*Id*. at 12-13). As a patrol, or beat, officer, he was assigned to certain areas of the city, answered calls, and attended community meetings, among other things. (*Id*. at 14). Patrol officers were required to attend the monthly neighborhood community meetings where the officer would give a report to the residents. (*Id*. at 28-29). Officers had to complete a report after the community meetings stating the date, attendance numbers, community concerns, and how the officer planned to address those concerns. (*Id*. at 30).

Phillips was also designated at a Field Training Officer ("FTO") in 2013 or 2014. (*Id*. at 16-17). As an FTO, Phillips would help train new officers as they came into the North Precinct. (*Id*. at 17). FTOs are expected to be a role model for new officers and ensure those new officers understand the expectations of the job, the policies of the department, and correct application of the concepts and procedures learned at the police academy. (Doc. 13-4 ("Gary Aff.") at 2). The FTO designation

gave Phillips a five percent pay increase, which amounted to approximately $160.00 per month additional pay. (Phillips Dep. at 17, 25-26).

In February 2017, Lieutenant Donald Gary, an African American male, was assigned as the Unit Commander of the North Police Precinct and became Phillips' supervisor. (Gary Aff. at 2). Shortly after his arrival, Lt. Gary met with each officer in the North Precinct, including Phillips, and communicated his performance expectations. (*Id.*; Phillips Dep. at 33). Lt. Gary discussed with Phillips his "standard for high officer productivity" which included engagement in the community by attending the designated neighborhood meetings, providing residents with useful information, completing monthly reports documenting resident concerns, inquiring about those concerns, and providing follow-up with any complaints. (Gary Aff. at 3).

All police officers are required to fill out daily reports which included information regarding the activity that occurred each day. (Phillips Dep. at 32). Those activity reports were then used by the sergeants to complete monthly reports regarding officer activity. (*Id.* at 32; Gary Aff. at 3-4). The reports included the number of traffic stops, citations, arrests, and Field Intelligence Observations ("FIO").[3] (Gary Aff. at 3-4). Lt. Gary used these reports to measure an officer's

---

[3] FIOs are reports of suspicious or potentially criminal activity. (Gary Aff. at 4).

level of activity. (*Id*.). In Lt. Gary's first five months at the North Precinct, the reports show that Officer Phillips made three[4] arrests and three traffic stops, reported one FIO, and issued no[5] citations. (Doc. 13-2 at 60-65). The reports are signed by the sergeant, lieutenant and captain. (*Id*.). Some of the forms are also initialed, but it is unclear whether those initials are those of Phillips or someone else. (*Id*.). Additionally, some of the forms contain comments. (*Id*.). The comments include the following:

- "Only one traffic stop in a month is not acceptable. No traffic stops = no citations. (*Id*. at 60).

- "Officer Phillips worked 21 days. Need more FIOs, Good Morning Cards and Traffic Stops. Needs to show activity, training required action to teach." (*Id*. at 62).

- "Poor Performance for FTO training rookie officer." (*Id*. at 64).

There is nothing in the record establishing that these comments were communicated to Phillips or otherwise discussed with him in any way. Based on these reports, Lt. Gary concluded that Phillips "was not an active officer." (Gary Aff. at 4).

---

[4] Although Lt. Gary's affidavit states that Phillips made one arrest during this time period, the report signed in March 2017 has arrows indicating that the number for arrests and citations should be switched. (Doc. 13-2 at 61).

[5] The only reference to any citations in the reports is from the one dated March 2017, but, as explained in footnote 4, the arrows indicate that number should be attributed to arrests and not citations. None of the other reports show any citations, although Lt. Gary's affidavit states Phillips issued three citations during this time period. (Doc. 13-2 at 60-65).

5

Lt. Gary also received reports that Phillips was not attending the required community meetings in Fountain Heights, his designated area. (*Id*.; *see* doc. 13-2 at 68-70). Lt. Gary reviewed the quarterly community concerns reports compiled by Captain Stevens of the North Precinct to see what information had been reported by Phillips. (Gary Aff. at 5-6). The first two quarterly reports from 2017 contained the exact same information. (*Id*. at 6). "The fact that the information reported from the monthly community meetings did not change over the course of 6 months, indicated [to Lt. Gary] that Phillips was either not attending the meetings as required or disengaged and not putting forth the effort to take the community's concerns [seriously] nor address the concerns." (*Id*.).

On June 9, 2017, Phillips was sent on a call in the Fountain Heights area regarding an incident between Bonderia Lyons, the vice president of the Fountain Heights community association, and her son. (Phillips Dep. at 20-21). According to Phillips, Lyons wanted him to arrest her son, but Phillips refused because the son had not done anything wrong. (*Id*. at 20). As Phillips was explaining this fact to Lyons, Lyons began using "all kinds of racial slurs. . . . So after a rant of cussing and screaming and hollering in the streets, we had to arrest her for disorderly conduct." (*Id*. at 21).

The next day was the monthly community meeting for Fountain Heights. (*Id*.). Sergeant Lockett, Lt. Gary, and Jerry Mason attended the meeting with

6

Phillips because they knew "tensions were going to be high." (*Id.*). When Phillips was asked to speak at the meeting, Lt. Gary interpreted Phillips' behavior as "not interested in being there." (Gary Aff. at 5). Phillips stated that he did not have any information to share. (*Id.*).

At some point, Roderick Foster, who was Lyons' husband according to Phillips,[6] came to the meeting. (Phillips Dep. at 21). Because Foster had outstanding warrants, Phillips had been instructed to arrest him if he appeared at the meeting. (*Id.*). Therefore, Phillips approached Foster who pulled out a gun and told Phillips that "he was sent from God to kill [Phillips] that day." (*Id.* at 21-22). Foster was arrested and charged with attempted murder. (Gary Aff. at 5).

While Phillips detained Foster, Lt. Gary and Lyons approached Phillips. (Phillips Dep. at 22). Lyons stated that "everything was fine until [Phillips] brought his cracker *ss to Fountain Heights, and, . . . that [Phillips] needed to go back over the hill with the rest of them." (*Id.*). Lt. Gary was standing next to Lyons as she spoke, and others from the Fountain Heights community were also present. (*Id.* at 23). Phillips contends Lt. Gary was "nodding along" to what Lyons said. (*Id.*). After this confrontation, Foster, who was under arrest, refused to ride in the police

---

[6] Lt. Gary's affidavit states Foster was a male friend of Lyons. (Gary Aff. at 5).

car with Phillips because he was white. (*Id*.). Lt. Gary had Jerry Mason (who is presumably African American) transport Foster to jail. (*Id*.).

Two days after this incident, Phillips was informed that he was being removed from his position as a beat officer and reassigned as a utility officer. (*Id*.). Utility officers rotate among the district to provide as-needed coverage during the days beat officers are not working. (*Id*.; Gary Aff. at 6). Utility officers do not have control over their assignments and are assigned to different locations daily based on need. (Phillips Dep. at 28). Utility officers are not assigned a specific patrol vehicle, like beat officers, but still have the use of a car. (*Id*. at 27). There is no difference in pay, benefits, or job duties for officers assigned to beat or utility. (Gary Aff. at 6). It is undisputed the decision was made by Lt. Gary to reassign Phillips. (Gary Aff. at 6; Phillips Dep. at 23). Lt. Gary concluded that "Phillips was not engaged in the community, his officer productivity was low, and his safety was at risk. I made the decision to reassign Phillips because of his performance deficiencies that reflected a lack of engagement in the community which escalated to the point where his life was threatened." (Gary Aff. at 6).

In addition to this reassignment, Lt. Gary also removed Phillips as the FTO for the Northern Precinct. (Gary Aff. at 6; Phillips Dep. at 24-25). Phillips was replaced by La'Quaylin Parhm, an African American female. (Gary Aff. at 6; Phillips Dep. at 36). Parhm and Phillips graduated from the police academy at the

same time. (Phillips Dep. at 36). According to Phillips, after the police academy Parhm was a patrol officer for about a year and then moved into a community role where she "didn't do patrol or train or do any of the activities a patrol officer would. It was more or less, like, setting up community events and things of that nature." (*Id*. at 36-37). Lt. Gary made the decision to place Parhm in the FTO position because he "noticed rookies would often go to Parhm for questions," she had previously served as an alternative FTO, and "her productivity was high which showed that she was engaged in the community." (Gary Aff. at 6-7).

### III. DISCUSSION

Phillips' complaint consists of a single count: race discrimination in violation of Title VII and § 1981.[7] (Doc. 1-1 at 6-8). Section 1981, however, does not provide a cause of action against state actors; instead, claims against state actors or allegations of § 1981 violations must be brought pursuant to § 1983. *Butts v. County of Volusia*, 222 F.3d 891, 892–94 (11th Cir. 2000). Although not clear from the complaint, the complaint mentions 42 U.S.C. § 1983 in the first section, entitled "Jurisdiction," (doc. 1-1 at 5), and the court assumes this mention is sufficient to properly allege a discrimination claim against the City under § 1981.

---

[7] In actuality, the complaint does not contain any separate counts or claims. Instead, Section III. of the complaint is entitled "Statement of Plaintiff's claims under Title VII and Section 1981." (Doc. 1-1 at 6).

9

That being said, however, in Plaintiff's opposition brief to the motion for summary judgment, Plaintiff argues as if there is a separate § 1983 claim against the City and seemingly contends that there was a deprivation of his rights as a result of an official policy or custom.[8] (Doc. 14 at 10-11). A municipality may not be held liable for the torts of its employees on a *respondeat superior* theory. *Morro v. City of Birmingham*, 117 F.3d 508, 514 (11th Cir. 1997) (citation omitted). "Instead, municipalities may only be held liable for the execution of a governmental policy or custom." *Id*. The complaint, however, does not make any allegations whatsoever regarding a separate violation of § 1983 by the City.[9] (*See id.*). It does not contain a separate count for municipality liability under § 1983 and none of the facts alleged in the complaint relate to a claim under § 1983.

"A summary judgment memorandum is not a proper vehicle for amending the pleadings." *McKenzie v. Talladega Bd. of Educ.*, 242 F. Supp. 3d 1244, 1255 n.12 (N.D. Ala. 2017); *see Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint in a brief opposing summary judgment."). The mere reference to § 1983 in the opening paragraph of

---

[8] The City also addresses a potential § 1983 claim in its briefing.

[9] To impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation. *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

the complaint, without any allegations to support a claim, is insufficient to plead that claim.[10] *See Pierre v. City of Miramar, Fla., Inc.*, 537 F. App'x 821, 827 (11th Cir. 2013) (dismissal of section 1983 claim against municipality proper where the complaint alleged that the city had a policy or custom, but made no factual allegations supporting the existence of such a policy or custom). The court will address only the claim presented by the complaint: that of race discrimination in violation of Title VII and § 1981, brought pursuant to § 1983.

### A. Title VII Claims

The City contends summary judgment is proper because Phillips failed to establish a prima facie case of race discrimination because he was not subject to an adverse employment action and he cannot identify a similarly situated comparator. (Doc. 13-1 at 13-16). Even if he could establish a prima facie case, the City maintains summary judgment is proper because the City articulated legitimate, nondiscriminatory reasons for its actions and there is no evidence of pretext. (*Id.* at 16-18). For the reasons stated below, the court concludes that there are no material issues of fact in this case and the City is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56.

---

[10] Even if the court were to address the claim, there is absolutely no evidence in the record to support it.

Analysis of a Title VII disparate treatment claim based on circumstantial evidence as the one presented[11] here requires the application of the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004). Under this framework, a plaintiff must establish a prima facie case of disparate treatment by showing: (1) he is a member of a protected class; (2) he was subjected to adverse employment action; (3) his employer treated similarly situated employees outside his class more favorably; and (4) he was qualified to do the job. *See Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999). After the plaintiff meets this initial burden, the employer has the burden to articulate a legitimate, nondiscriminatory reason for the employment decision. *Wilson*, 376 F.3d at 1087. This burden involves no credibility determination, *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993), and has been characterized as "exceedingly light." *Perryman v. Johnson Prod. Co.*, 698 F.2d 1138, 1141 (11th Cir. 1983). As long as the employer articulates "a clear and

---

[11] The court rejects Plaintiff's contention that there is direct evidence of discrimination in this case. (Doc. 14 at 11-13). "Direct evidence of discrimination is 'evidence which, if believed, would prove the existence of a fact in issue without inference or presumption.'" *Bass v. Bd. of County Comm'rs*, 256 F.3d 1095, 1105 (11th Cir. 2001) (quoting *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)). "Only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [race], constitute direct evidence of discrimination." *Earley*, 907 F.2d at 1081 (citations and quotations omitted). Plaintiff does not point to any specific statement or action, but instead states "according to the facts as stated above, the plaintiff has provided this court with direct evidence which has not been addressed." (Doc. 14 at 13). The court has reviewed the entire record and there is simply no evidence of any statement or actions "whose intent could be nothing other than to discriminate." *Earley*, 907 F.2d at 1081. The court, therefore, analyzes Plaintiff's claims under the familiar burden-shifting analysis for claims based on circumstantial evidence.

reasonably specific" non-discriminatory basis for its actions, it has discharged its burden of production. *Texas Dept. of Cmt'y Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981). After an employer articulates one or more legitimate, non-discriminatory reasons for the employment action, the plaintiff must show the proffered reason was a pretext for illegal discrimination. *Id.* If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot simply recast the reason but must "meet that reason head on and rebut it." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000).

The court is mindful that the Eleventh Circuit has clarified that the framework is not the only way for the plaintiff to survive summary judgment in a discrimination case. *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). Rather, the plaintiff can survive summary judgement "if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id.* A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decision-maker. *Id.*

    1. **Prima Facie Case**

As stated above, the City argues Phillips failed to establish a prima facie case of race discrimination because he was not subject to an adverse employment action

and he cannot identify a similarly-situated comparator. (Doc. 13-1 at 13-16). The court discusses each contention below.

### a. Adverse Employment Action

Phillips contends that he suffered two separate adverse employment actions: (1) when he was "demoted" from a beat officer to a utility officer; and (2) when his FTO designation was removed. An employee establishes an "adverse employment action" by proving that a decision of the employer "impact[ed] the terms, conditions, or privileges of [her] job in a real and demonstrable way." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001) (internal quotation marks omitted). This "impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." *Id*. The "employee must show a serious and material change in the terms, conditions, or privileges of employment" so that a "reasonable person in the circumstances" would find "the employment action [to] be materially adverse." *Id*.; *see also Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1203 (11th Cir. 2013) (explaining that the "loss of supervisory responsibilities" is not a material change absent a showing of "significantly different responsibilities" (citation and internal quotation marks omitted)).

With regard to his reassignment as a utility officer, Phillips contends that it was a demotion because utility officers can be assigned "wherever they want at any point in time" and they "don't have any freedom of movement." (Phillips Dep. at

27-28). He also testified that utility officers are not assigned a particular car, what area they are going to patrol, and what is expected each day. (*Id*. at 27). That being said, there is no change in pay, benefits or job duties. (Gary Aff. at 6). Utility officers rotate among jobs to provide coverage where needed on off-days of the beat officers. (*Id*.).

This is exactly the type of claim that "[o]ur circuit does not favor." *Kidd v. Mando American Corp.*, 731 F.3d 1196, 1203 (11th Cir. 2013). The Eleventh Circuit has explained:

> "Work assignment claims strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities." *Davis*, 245 F.3d at 1244. And it is by now axiomatic that "Title VII is not designed to make federal courts sit as a super-personnel department that reexamines an entity's business decisions," *id*. at 1245 (internal quotation marks omitted) (citing *Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir. 1991)).

*Id*. at 1203-04. As a result, "[i]n the vast majority of instances, ... an employee alleging a loss of prestige on account of a change in work assignments, without any tangible harm, will be outside the protection afforded by Congress in Title VII's anti-discrimination clause." *Trask v. Secretary, Dep't of Veterans Affairs*, 822 F.3d 1179, 1194 (11th Cir. 2016) (quoting *Davis*, 245 F.3d at 1245).

Phillips' reassignment from patrol officer to a utility officer does not constitute an adverse employment action under Eleventh Circuit standards. There is no difference in pay or benefits, or any other term or condition of employment.

15

(Gary Aff. at 6). In fact, utility officers were used to fill-in for off-duty patrol officers as needed, (*id*.), thus performing the same functions as a patrol officer. Although Phillips testified that he did not know which car he would be assigned as a utility officer, he still had use of a patrol car, as he did as a beat officer. (Phillips Dep. at 27). The Eleventh Circuit has rejected similar claims for failure to establish an adverse employment action. *See Kidd*, 731 F.3d at 1203-04 (rejecting a "demotion claim . . . grounded on a loss of supervisory responsibility" alone for lack of an adverse employment action); *Edwards v. Ambient Healthcare of Ga., Inc.*, 674 F. App'x 926, 930 (11th Cir. 2017) (finding the plaintiff "did not allege that she suffered a materially adverse action" where she "did not allege that [the employer] cut her pay, took away her title, or did anything other than make her existing job duties more difficult.").

The removal of his FTO status is different from the reassignment in that the change resulted directly in the denial of additional pay. Phillips testified that he received $160.00 more a month for the FTO designation. "[A]ctions which deprived [the plaintiff] of compensation which he otherwise would have earned clearly constitute adverse employment actions for purposes of Title VII." *Bass v. Bd. of Cty. Comm'rs, Orange Cty., Fla.*, 256 F.3d 1095, 1118 (11th Cir. 2001); *see also Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1561 (11th Cir. 1986) (no amount of diminished pay can be written off as beyond Title VII's protections on

the ground that such loss was "*de minimis*"). As such, the removal of Phillips' FTO designation was an adverse employment action under Title VII.

### b. Similarly Situated Comparators

The City also contends that Phillips' prima facie case fails because he failed to identify a similarly situated comparator. (Doc. 13-1 at 16). Phillips's opposition brief responds by stating that "[s]howing how similarly situated employees are treated is not the only way to prove a prima facie case," (doc. 14 at 10), but then fails to explain how he has "present[ed] circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith*, 644 F.3d at 1328. Regardless, even "[i]f a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." *Holifield*, 115 F.3d at 1562 (citing *Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 182 (1st Cir. 1989) (emphasis added)). The court, therefore, turns to Phillips' evidence of discrimination and pretext argument.

### 2. Legitimate Non-Discriminatory Reasons and Pretext

The City has carried its exceedingly light burden of articulating legitimate, nondiscriminatory reasons for the alleged demotion of Phillips. Lieutenant Gary "made the decision to reassign Phillips because of his performance deficiencies that reflected a lack of engagement in the community which escalated to a point where [Phillips'] life was threatened." (Gary Aff. at 6).

17

Because Defendant satisfied its burden of production of a legitimate, nondiscriminatory reason for Plaintiff's termination, Plaintiff must come forward with evidence sufficient to permit a reasonable fact finder to conclude the reasons Defendant gave were pretextual. *Burdine*, 450 U.S. at 253. Plaintiff may do so by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Defendant's] proferred legitimate reasons for its actions a reasonable factfinder could find them unworthy of credence." *Springer v. Convergys Customer Mgmt. Group, Inc.*, 509 F.3d 1344, 1348-50 (11th Cir. 2007). It is important to note that conclusory allegations of discrimination, without more, are insufficient to show pretext. *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996). "A reason is not pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Brooks v. County Comm'n of Jefferson County*, 446 F.3d 1160, 1162 (11th Cir. 2006.)

To show pretext, a plaintiff may not merely quarrel with the wisdom of the employer's reason but must instead meet the reason head on and rebut it. *See Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010). The inquiry into pretext is based on "the employer's beliefs and not the employee's own perceptions of his performance." *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997). The question is not whether the employee actually had performance problems but "whether [his] employers were dissatisfied with [him] for these or other non-

discriminatory reasons, even if mistakenly or unfairly so . . . ." *Alavarez*, 610 F.3d at 1266.

Plaintiff does not make any argument in his brief regarding pretext. (*See* doc. 14 at 8-10). Likewise, the court cannot find any evidence of pretext in the record before it. Simply put, there is no evidence from which a reasonable juror could conclude that Phillips' reassignment or removal of the FTO designation was a result of race discrimination. Summary judgment is due to be granted in favor of the City on Phillips' claims of discrimination in violation of Title VII.

### B. Section 1981 Claims Brought Pursuant to Section 1983

As stated above, Phillips seeks recovery for race discrimination under not only Title VII, but also § 1981. The legal elements for Title VII and § 1981 are the same and claims brought pursuant to those statutes are analyzed in the same manner. *See Bolton v. Baldwin Cty. Pub. Sch.,* 47 F. Supp. 3d 1342, 1349 (S.D. Ala. 2014). Phillips' claims are based on the same facts, (doc. 1-1 at 6-8), and the court's discussion of his discrimination claims are the same whether the court is considering those claims under Title VII or § 1981. Because the court determined that no reasonable fact finder could find these incidents constitute discrimination under Title VII and the legal elements are the same, the City is entitled to summary judgment on Phillips' § 1981 discrimination claims.

## IV. CONCLUSION

For the foregoing reasons, Defendant the City of Birmingham is entitled to judgment as a matter of law on all the claims asserted in Plaintiff's Amended Complaint. As such, Defendant's motion for summary judgment (Doc. 13) is due to be granted. A separate order will be entered.

**DATED** this 15th day of October, 2019.

_____
**JOHN E. OTT**
Chief United States Magistrate Judge